Filed 5/2/14  P. v. Boyd CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>SHERMAN BOYD,<br><br>Defendant and Appellant. | B244186<br><br>(Los Angeles County<br>Super. Ct. No. BA374014) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Victor Greenberg, Judge.  Affirmed with directions.

Linn Davis, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and Roberta L. Davis,  Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant, Sherman Boyd, appeals his conviction for possession of heroin for sale, possession of cocaine base for sale, resisting an executive officer and disobeying a court order, with gang, prior drug conviction, on bail, prior prison term and prior serious felony conviction findings (Health & Saf. Code, §§ 11351, 11351.5, 11370.2; Pen. Code, §§ 69, 166, subd. (a)(4), 12022.1, 667.5, 667, subds. (b)-(i)).[1] Boyd was sentenced to state prison for a term of 22 years.

The judgment is affirmed.

## BACKGROUND

Viewed in accordance with the usual rule of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established the following.

1. *Prosecution evidence.*

 a. *July 25, 2010 (count 2).*

About 7:30 p.m. on July 25, 2010, Los Angeles Police Officers Gilbert Rendon and Brian Cooney were in full uniform and driving a marked police car. They were part of the Gang Impact Team of the Newton Division Community Law Enforcement and Recovery Program (CLEAR). CLEAR's responsibility was to gather intelligence on gang activity, speak to victims of gang crimes, and talk to gang members. One of the active gangs in CLEAR's territory was a Blood gang called "All For Crime (ALC).

Rendon and Cooney were driving on East 41st Place in part because the area was known for gang activity and drug sales. They saw defendant Boyd and Vincent Ruiz outside 1445 East 41st Place. Boyd and Ruiz were documented members of AFC. Rendon had been to this house in May 2010 to assist in taking an AFC murder suspect into custody. Kathy Pique Brooks, who owned the house, told Rendon she had lost control of her property and was having a hard time keeping unwanted visitors away. The house was notorious for heroin sales; several drug arrests had taken place there and an alley behind the house was littered with balloons discarded by heroin users.

---

[1]   All further references are to the Penal Code unless otherwise specified.

The officers saw Boyd sitting on one side of the front porch, facing the street. Ruiz was standing next to the porch on the other side, facing toward Boyd. There was a stack of cash near Ruiz on the porch ledge and Ruiz was counting multi-colored objects into his hand. Heroin is commonly packaged in balloons and it appeared Boyd was handling balloons containing heroin. As the officers drove up to the house, Rendon saw Boyd look toward them, then look at Ruiz and say something to him. Ruiz stopped what he was doing. The officers parked and exited the patrol car. Boyd stood up and went into the house. Ruiz jumped onto the porch, grabbed the cash, followed Boyd into the house and locked the door. The officers called for backup.

Brooks, who had been in her bedroom watching television, realized the police were outside. She went out the back door, followed by Boyd. Meanwhile, Ruiz went into the bathroom. Besides Boyd and Ruiz, police subsequently found seven other people in Brooks's house. Brooks told Officer Rendon, "None of these people are allowed on my property. I already told all of them they are not allowed on my porch or my house. I want them out of my house." At trial, Brooks acknowledged having made this statement, but testified she had not meant to include Boyd and Ruiz in the group of people not allowed in her house. She testified Boyd and Ruiz had come over for dinner and they were only out on the porch for a minute, not doing anything, before coming inside to play dominoes.

In the bathroom next to Brooks's bedroom, officers found six balloons containing heroin inside the toilet water tank. These balloons were consistent with the objects Ruiz had in his hands when the officers first approached the house. Officers found $423 underneath a playpen in the living room. Brooks denied that either the heroin balloons or the cash belonged to her.

Officer Rendon opined Ruiz possessed the heroin for purposes of sale based on the following: there were six individually-wrapped portions of heroin; Ruiz did not have any paraphernalia for ingesting heroin on his person; Ruiz possessed a large amount of cash; and, the area was known for heroin sales. Boyd, too, did not possess any paraphernalia for ingesting heroin.

b. *November 11, 2010 (counts 4-6).*

On the afternoon of November 11, 2010, Los Angeles Police Officers Mario Flores and Manuel Gomez, also part of Newton's CLEAR unit, were on patrol monitoring gang activity. They saw Boyd with a group of people, including several other AFC gang members and a parolee who had an outstanding warrant for a weapons violation. When the officers walked up to the location, the group scattered. Backup officers arrived and entered the residence looking for the parolee. Boyd yelled obscenities at the officers, struggled with them, and was eventually handcuffed. A plastic baggie inside Boyd's sock contained cocaine base which had been separately packaged inside five other plastic baggies. Officer Garcia opined Boyd possessed this cocaine for purposes of sales.

c. *Gang evidence.*

Officer Rendon testified as a gang expert. Gangs earn money by selling heroin, then use the proceeds to purchase more drugs or weapons, or deposit the money in the accounts of fellow gang members who are incarcerated. "It's common for gang members to find certain locations, it could be a corner, could be certain houses where they post up and start selling narcotics. And if it's a house, it could be a friend's house, it could be a relative's house or it could be someone who they just chose to establish their sales out of, they just chose the property." Gang members usually conduct drugs sales in the open and they are constantly on the lookout for police cars. Selling drugs out in the open intimidates the community by showing that gang members will do whatever they want within their territory.

4

Officer Chase Lambert testified as an expert on the AFC gang. AFC began as a tagging crew, a group which primarily engages in writing graffiti. In the early 1990's, AFC was adopted as a Blood gang by the Rolling 40's Pirus. At the time of trial, AFC had 50 to 60 members. Their primary activities included vandalism, street robberies, assaults with deadly weapons, burglaries and shootings. Based on a hypothetical rooted in the July 25 incident, Lambert opined Boyd had been engaged in drug trafficking for the benefit of the AFC gang. He believed Boyd and Ruiz were working together as gang members and that their drug sales benefitted the gang by raising revenue as well as instilling fear in the community.

2. *Defense evidence.*

Boyd testified he was 34 years old at the time of trial. He had been a founding member of AFC. He joined when he was a teenager and AFC was still a tagging crew. Although he was still an AFC member at the time of trial, he considered himself more of an associate than an active member. He did not know if AFC sold drugs, but he knew AFC members had been arrested for selling drugs. He himself had been to prison twice.

On July 25, 2010, he was not helping Ruiz sell heroin. Brooks's porch "was like a hangout . . . for everyone in the area. It's more like a lounge." He and Ruiz were out there just talking and smoking. Ruiz was an AFC member whom Boyd had known for a few years. Boyd did not see Ruiz counting balloons; nor did he see a stack of money on the porch ledge. Boyd did not see the officers arrive; rather, he "heard them when they pulled up because they called out for Ruiz," By the time Boyd saw the officers he was already going into the house. He denied entering the house to avoid the officers and he denied hiding heroin in the bathroom.

## CONTENTIONS

1. There was insufficient evidence to sustain the conviction for possessing heroin for sale.

2. There was insufficient evidence to sustain the gang enhancement.

3. [By the Attorney General] A clerical error in the abstract of judgment should be corrected.

5

**DISCUSSION**

1. *There was sufficient evidence of possessing heroin for sale.*

Boyd contends his count 2 conviction for possessing heroin for sale[2] must be reversed for insufficient evidence. This claim is meritless.

a. *Legal principles.*

"In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence – that is, evidence that is reasonable, credible, and of solid value – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] The federal standard of review is to the same effect: Under principles of federal due process, review for sufficiency of evidence entails not the determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.] The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence. [Citation.] ' "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' [Citations.]" ' [Citation.]" (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

---

[2]   Boyd was convicted on count 2 for possessing heroin for sale arising out of the July 2010 incident. He was convicted on count 4 for possessing cocaine base for sale based on the November 2010 incident.

" 'An appellate court must accept logical inferences that the [finder of fact] might have drawn from the circumstantial evidence.' [Citation.] 'Before the judgment of the trial court can be set aside for the insufficiency of the evidence, it must clearly appear that on no hypothesis whatever is there sufficient substantial evidence to support the verdict of the [finder of fact].' [Citation.]" (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573.) As our Supreme Court said in *People v. Rodriguez, supra,* 20 Cal.4th 1, while reversing an insufficient evidence finding because the reviewing court had rejected contrary, but equally logical, inferences the jury might have drawn: "The [Court of Appeal] majority's reasoning . . . amounted to nothing more than a different weighing of the evidence, one the jury might well have considered and rejected. The Attorney General's inferences from the evidence were *no more inherently speculative* than the majority's; consequently, the majority erred in substituting its own assessment of the evidence for that of the jury." (*Id.* at p. 12, italics added.)

b. *Discussion*.

Boyd contends this conviction must be reversed because there was no evidence showing he "exercised dominion or control over the heroin or committed any act which aided the perpetrator or encouraged commission of the offense with knowledge of the latter's wrongful purpose." Although Boyd's first claim has arguable merit, his second is clearly meritless and, therefore, we will affirm his conviction on count 2.

(1) *Constructive possession.*

The Attorney General argues there was sufficient evidence to prove Boyd possessed heroin for sale based on the doctrine of constructive possession. This issue presents a close question.

"The elements of possession of narcotics are physical or constructive possession thereof coupled with knowledge of the presence and narcotic character of the drug. [Citations.] Constructive possession occurs when the accused maintains control or a right to control the contraband; possession may be imputed when the contraband is found in a place which is immediately and exclusively accessible to the accused and subject to his dominion and control, or to the joint dominion and control of the accused and another.

7

[Citation.]  The elements of unlawful possession may be established by circumstantial evidence and any reasonable inferences drawn from such evidence." (*People v. Newman* (1971) 5 Cal.3d 48, 52, disapproved on other grounds by *People v. Daniels* (1975) 14 Cal.3d 857, 862.)

In *People v. Austin* (1994) 23 Cal.App.4th 1596, disapproved on other grounds in *People v. Palmer* (2001) 24 Cal.4th 856, 865-866, for example, a reverse sting operation was interrupted just as the defendants opened the trunk of the undercover officer's car and exposed the cocaine to view.  *Austin* affirmed convictions for possession of a controlled substance for sale, even though the defendants had fled without ever touching the drugs, because the evidence showed one defendant held the undercover officer at gunpoint while the other defendant took the officer's key and opened the trunk containing the cocaine.  "At that time, defendants were in constructive possession of the cocaine because it was immediately accessible to them in a place under their control." (*People v. Austin, supra,* at p. 1609.)

Here, the Attorney General argues the evidence "established that appellant was aware of the heroin balloons and money, and exercised joint dominion and control over the drugs with Ruiz."  We agree the evidence showed Boyd must have been aware of what Ruiz was doing:  they were together on the porch; Ruiz was handling the colored balloons so openly the officers could see them from the street; and, there was a stack of cash in plain sight right next to Ruiz.  The Attorney General argues the evidence also showed Boyd had the right to exercise control over the drugs.  The Attorney General notes Officer Renton testified "original gangsters" or "shot callers" would "tell the younger members what to do, what not to do, stuff like that," and asserts that, as a founding member of the AFC gang, Boyd had authority over the younger Ruiz. But Renton had not been discussing the AFC gang in particular, and having the authority to "tell younger gang members what to do" might not be quite the same thing as "exercising dominion and control" over the drugs in another gang member's possession. (Cf. *People v. Sifuentes* (2011) 195 Cal.App.4th 1410, 1417 [dominion and control not

8

established because "gang expert did not testify *any* gun possessed by a gang member automatically constitutes a gang gun to be shared with all other gang members"].)

Hence, we question whether the "right to exercise control" evidence was sufficient, and acknowledge the evidence may have shown no more than that Boyd had been knowingly present while Ruiz engaged in drug trafficking. Mere presence while another commits an offense is not illegal. (*People v. Stankewitz* (1990) 51 Cal.3d 72, 90 ["Nor is an individual's presence at the scene of a crime or failure to prevent its commission sufficient to establish aiding and abetting."].) However, we need not resolve this issue because the Attorney General's alternative theory adequately justifies Boyd's conviction.

(2) *Aiding and abetting the possession of heroin for sale.*

The Attorney General's alternative argument is that substantial evidence supported Boyd's conviction on the theory he aided and abetted Ruiz's possession of heroin for sale. We agree.

"A person aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime." (*People v. Cooper* (1991) 53 Cal.3d 1158, 1164.) It is true "that in general neither presence at the scene of a crime nor knowledge of, but failure to prevent it, is sufficient to establish aiding and abetting its commission. [Citations.] However, '[a]mong the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense.' [Citation.]" (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409.)

The Attorney General argues there was substantial evidence Boyd aided and abetted Ruiz's drug trafficking by acting as a lookout: "As Ruiz conducted his drug sales, appellant sat nearby on the porch and faced the street, so he was able to see when people approached the property. When police arrived, appellant notified Ruiz and abruptly fled the porch and entered the house. Ruiz immediately jumped over the porch

9

ledge and followed appellant into the house, taking the drugs and money. Appellant thus demonstrated a consciousness of guilt by fleeing the porch, and also blatantly helped Ruiz by warning him about the police presence." "The officers testified that when they approached, Ruiz was counting the heroin balloons in his hands and did not stop doing so, despite the officers' approach, until appellant said something to Ruiz. . . . [T]he fact that appellant was facing the street indicated that he was acting as a lookout, so Ruiz would not have to pay attention to who was approaching. Appellant served his purpose of warning Ruiz when police arrived. . . . Because of appellant's warning, Ruiz had time to jump onto the porch, take the illicit items into the house, and try to hide them."

Boyd concedes the officers saw him say something to Ruiz, but he argues there was no showing Ruiz reacted as if in response to a warning because "[b]oth officers testified that Ruiz just stood there." Not so. Rendon testified: "And then as I'm pulling up closer, that's when I see Sherman Boyd. He's sitting on the porch and he looked over to Vincent Ruiz after looking in our direction, and it appeared that he had said something to him. *And that's when Vincent Ruiz stopped what he was doing*." (Italics added.) Asked if he could see or hear any interaction between Boyd and Ruiz on the porch, Cooney testified: "No, didn't hear conversation. *They looked at each other, said something, and ran inside the residence.*"[3] (Italics added.)

---

[3] To the extent Ruiz may have just stood there motionless for a short time *after* Boyd's warning but *before* they fled from the porch, Renton's expert testimony included this explanation: "It's common for gang members to see [police] gang cars come by. If they drive by, [the gang members] stay in place. Once the officers in the gang car . . . . come to a stop and start opening doors, that's when the gang members usually know, 'Okay, they are going to get off and talk to me. I want nothing to do with them,' or 'I am going to stay in place and talk to them.' "

Hence, there was ample evidence from which a rational jury could conclude Boyd had been acting as a lookout in order to assist Ruiz's drug trafficking. " 'It has been consistently held that one who was present . . . to serve as a lookout, or to give warning of approach of anyone seeking to interfere . . . is a principal in the crime committed. Any one of the above purposes mentioned would be sufficient upon which to base . . . aiding and abetting . . . .' [Citations.]" (*People v. Bishop* (1988) 202 Cal.App.3d 273, 281, fn. 6.)

Hence, there was sufficient evidence to sustain Boyd's conviction for possessing heroin with intent to sell.

2. *There was sufficient evidence to sustain the gang enhancement.*

Boyd contends there was insufficient evidence to sustain the gang enhancement (§ 186.22, subd. (b)) because there was no showing the gang expert's testimony about the AFC gang's primary activities was reliable. This claim is meritless.

a. *Legal principles.*

As we explained in *People v. Duran* (2002) 97 Cal.App.4th 1448: "Section 186.22, subdivision (b)(1) imposes additional punishment when a defendant commits a felony for the benefit of, at the direction of, or in association with a criminal street gang. To establish that a group is a criminal street gang within the meaning of the statute, the People must prove: (1) the group is an ongoing association of three or more persons sharing a common name, identifying sign, or symbol; (2) one of the group's primary activities is the commission of one or more statutorily enumerated criminal offenses; and (3) the group's members must engage in, or have engaged in, a pattern of criminal gang activity. [Citations.]" (*Id.* at p. 1457.)

"To trigger the gang statute's sentence-enhancement provision (§ 186.22, subd. (b)), the trier of fact must find that one of the alleged criminal street gang's primary activities is the commission of one or more of certain crimes listed in the gang statute. In *People v. Gardeley* [(1996)] 14 Cal.4th 605 . . . , that requirement was satisfied by the testimony of a police gang expert who expressed his opinion that the primary activities of the group in question were drug dealing and witness intimidation, both statutorily listed

11

crimes." (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 322.) "The phrase 'primary activities,' as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes is one of the group's 'chief' or 'principal' occupations. [Citation.] That definition would necessarily exclude the occasional commission of those crimes by the group's members. . . . [¶] Sufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute." (*Id.* at pp. 323-324.) "The testimony of a gang expert, founded on his or her conversations with gang members, personal investigation of crimes committed by gang members, and information obtained from colleagues in his or her own and other law enforcement agencies, may be sufficient to prove a gang's primary activities. [Citations.]" (*People v. Duran, supra,* 97 Cal.App.4th at p. 1465.)

   b. *Discussion*.

  Boyd asserts the trial record does not disclose "whether [Officer] Lambert's testimony as to the primary activities of AFC was reliable, because information establishing reliability was never elicited from him at trial," and that "[t]he record is silent as to where, when, or how Lambert obtained this information." Boyd also accuses Lambert of inexperience: "The facts upon which Officer Lambert relied were limited by minimal formal training and duration, to having at some time talk[ed] to an unspecified number of gang members, reading reports of other officers and talking to other officers." Boyd argues such "vague secondhand testimony cannot constitute substantial evidence" in this context. We are not persuaded.

  At the outset, we note that Boyd's reliance on two cases is misplaced. *In re Leland D.* (1990) 223 Cal.App.3d 251, 258-260, does not help Boyd because that case addressed the sufficiency of evidence to prove the "pattern of gang activity" element, not the "primary activity" element. And in the other case, *In re Alexander L.* (2007) 149 Cal.App.4th 605, the expert's testimony was limited to this: " 'I know they've committed quite a few assaults with a deadly weapon, several assaults. I know they've been involved in murders. [¶] I know they've been involved with auto

12

thefts, auto/vehicle burglaries, felony graffiti, narcotic violations.' " (*Id*. at p. 611.) This testimony was deemed insufficient because the expert "did not directly testify that criminal activities constituted [the gang's] primary activities. Indeed, on cross-examination, [he] testified that the vast majority of cases . . . he had run across were graffiti related." (*Id*. at p. 612, fn. omitted.) *Alexander L.* also held the expert's testimony lacked an adequate foundation "because information establishing reliability was never elicited from him at trial. It is impossible to tell whether his claimed knowledge of the gang's activities might have been based on highly reliable sources, such as court records of convictions, or entirely unreliable hearsay." (*Id.* at p. 612, fn. omitted.)

The evidentiary foundation missing in *Alexander L.* was present here. As the Attorney General argues, Lambert "had been a police officer for five years, all of which had been devoted to investigating and learning about gangs," and he "explained that his testimony regarding AFC was based on his personal experience as an officer on a gang task force that dealt with AFC, and on reliable hearsay sources such as conversations with AFC members and information collected by other officers."

Officer Lambert testified he had been a police officer for five years and is currently assigned to the Gang Enforcement Detail for Newton Division. He had completed a 40-hour course on gangs at the police academy, and a four-day advanced gang awareness course conducted by the Los Angeles County Sheriff's Department. While working in the Newton gang unit, he had spoken with AFC members, read reports by other officers about AFC crimes, and spoken with other officers about the gang. Lambert had qualified as a gang expert once before. Lambert testified his responsibilities included gathering intelligence on gang crimes and gang wars. This entailed "[s]peaking to other gang members, rival or whatever, members of the community. If they've seen anything, any trends, anything that's been happening. Documenting them, photographing them. Working with detectives, working with the community as well."

Lambert's testimony demonstrated the reliability of his opinion regarding the AFC's primary activities. (See *People v. Gonzalez* (2006) 38 Cal.4th 932, 944, 949 [gang expert opinion may be based on citizen informants, police reports and gang member contacts because these are reliable bases for opinion]; *People v. Hill* (2011) 191 Cal.App.4th 1104, 1124 ["gang expert may . . . rely on the hearsay statements of gang members"].) Moreover, Lambert had sufficient experience to provide reliable testimony. (See *People v. Williams* (1997) 16 Cal.4th 153, 195 [officer who was member of special gang unit and "had been involved with gangs for seven years" qualified as gang expert]; *People v. Valadez* (2013) 220 Cal.App.4th 16, 29 [gang expert had been police officer for 6½ years "and spent almost two years in a gang-enforcement division"]; *People v. McDaniels* (1980) 107 Cal.App.3d 898, 904 [deputy's 6½ year assignment with street gang detail qualified him as gang expert].)

There was sufficient evidence to sustain the gang enhancement.

3. *Correct abstract of judgment.*

The Attorney General points out the abstract of judgment contains a clerical error. The trial court imposed a consecutive two-year on-bail enhancement (§ 12022.1) on count 4, but the abstract of judgment reflects this enhancement was imposed on count 2. The abstract should be corrected to reflect imposition of this enhancement in connection with Boyd's conviction on count 4. (See *In re Candelario* (1970) 3 Cal.3d 702, 705 ["It is not open to question that a court has the inherent power to correct clerical errors in its records so as to make these records reflect the true facts. . . . The court may correct such errors on its own motion or upon the application of the parties."].)

**DISPOSITION**

The judgment is affirmed. The trial court is directed to prepare and forward to the Department of Corrections and Rehabilitation an amended abstract of judgment to reflect imposition of the on-bail enhancement in connection with count 4.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KLEIN, P. J.

We concur:

KITCHING, J.

ALDRICH, J.